**AYUDA, INC., et al.,**

v.

**Richard THORNBURGH, individually and as Attorney General of the United States, et al., Appellants.**

**No. 90–5293.**

United States Court of Appeals, District of Columbia Circuit.

Nov. 13, 1990.

Before WALD,* Chief Judge, EDWARDS and HENDERSON,** Circuit Judges.

---

\* Chief Judge Wald concurs in part and dissents in part from the order granting a stay, for the reasons stated in the accompanying opinion.

ORDER

PER CURIAM.

Upon consideration of appellants' motion for stay of Supplemental Order XIV, the response thereto, and the reply, and the parties' memoranda and the district court's Memorandum Opinion responding to certain questions posed by this court, it is

ORDERED that the motion for stay of Supplemental Order XIV be granted. Appellants have demonstrated satisfaction of the standards necessary for a stay pending appeal. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977); *D.C. Circuit Handbook of Practice and Internal Procedures* 38–39 (1987). In light of this Court's previous ruling that the district court lacked jurisdiction to review legalization determinations under the Immigration Reform and Control Act of 1986, *see Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325 (D.C.Cir.1989), *petition for cert. filed*, 58 U.S.L.W. 3451 (U.S. Dec. 27, 1989) (No. 89–1018), appellants have demonstrated a strong likelihood of success on the merits of their appeal, and appellees were unable to make this same requisite showing necessary to obtain interim injunctive relief in the district court. *See Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921 (D.C.Cir.1958).

HENDERSON, Circuit Judge, concurring:

I write separately to express my view that in light of this court's holding in *Ayuda, Inc. v. Thornburgh*, we should address *sua sponte* the jurisdictional question and vacate Supplemental Order XIV as unsupported by subject-matter jurisdiction. *See Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal*, 636 F.2d 531 (D.C.Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1352, 67 L.Ed.2d 336 (1981). In the absence of such complete relief, however, I concur in the granting of a stay.

---

\*\* Judge Henderson concurs in the order granting a stay, for the reasons stated in the accompanying opinion.

The dissent's theory of interim jurisdiction ignores the clear holding of *Ayuda* and the mandatory effect of precedent in this circuit. *See Association of Civilian Technicians, Montana Air Chapter v. FLRA*, 756 F.2d 172, 176 (D.C.Cir.1985) ("we are bound by the principle of *stare decisis* to 'abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court *en banc* has overruled it'") (quoting *Brewster v. Commissioner of Internal Revenue*, 607 F.2d 1369, 1373 (D.C.Cir.1979)). *Stare decisis* requires that we follow *Ayuda* and, at a minimum, stay the district court's injunction.

It makes no difference, as the dissent suggests, that the mandate in *Ayuda* was stayed pending disposition of the appellees' petition for *certiorari*. Once the *Ayuda* opinion was released it became the law of this circuit. Stay of the mandate merely delayed return to the district court of jurisdiction over the § 265 claims and the exercise of its duty to dismiss them;[1] it did not affect the district court's duty—or ours—to apply the law set forth in *Ayuda* to parties not involved in the appeal.

Nor is it relevant that another circuit has ruled differently on the jurisdictional question or that the United States Supreme Court has granted *certiorari* on the question.[2] Unless and until *Ayuda* is reversed or overruled by the United States Supreme Court or by this court *en banc*, *Ayuda* remains the law of this circuit and no amount of hardship the appellees may suffer as a consequence can confer jurisdiction on the district court.

WALD, Chief Judge, ·concurring in part and dissenting in part:

This motion for stay poses a difficult jurisdictional issue: who, if anyone, within our federal judicial hierarchy has the power to provide interim relief to ensure the survival in the coming months of the alien claimants in this case, who are anxiously awaiting a Supreme Court ruling that will determine whether they will be able to press their claims for legalization under the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1255a. It is a sufficiently difficult and troubling issue that neither side can find a controlling precedent to cite. And all sides must certainly feel some discomfort that immigrants, found by the district court to be eligible for legalization, and whose petition from a court of appeals ruling overturning one district court order applying to one subset of the group is presently awaiting decision by the Supreme Court,[1] are left with no recourse for interim relief.

These aliens, numbering between 4,000 and 6,000 persons, have sought interim relief from the district court in order to survive until the Supreme Court decides the jurisdictional issue. They introduced testimony before the district court showing that some among their numbers will likely go hungry or without shelter if they are not provided with the temporary work permits currently denied them by the Immigration and Naturalization Service ("INS")—permits, incidentally, that are routinely given to aliens who have deportation proceedings pending against them. These aliens, because they have sought relief in the form of declaratory judgment and injunction rather than in the context of deportation proceedings, currently must struggle to survive without such work permits pending the Supreme Court's decision on the jurisdictional issue. The district court, finding this situation intolerable, ruled that those alien claimants who have undergone eligi-

---

1. *See City of Cleveland, Ohio v. Federal Power Comm'n*, 561 F.2d 344, 346–48 (D.C.Cir.1977) (the mandate rule, under which a federal appellate court's decision establishes the law binding the lower court in the same litigation, is a specific application of the law of the case doctrine expressing the duty of a lower court to follow the higher court's decision on those issues decided on appeal).

2. *See Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555 (11th Cir.1989), *cert. granted sub nom. McNary v. Haitian Refugee Center, Inc.*, —— U.S. ——, 110 S.Ct. 2584, 110 L.Ed.2d 265 (1990).

1. Indeed, oral argument has already been held in the controlling case and a decision can be expected within a few months.

bility screening for permanent relief should be provided with temporary work permits.

The panel's sole reason for staying the district court's order is that this court has ruled—in one appeal from parts of one order governing one portion of the aliens involved in this case—that the district court had no jurisdiction to grant relief except in individual deportation proceedings. *See Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325 (D.C.Cir.1989), *petition for cert. pending*, 58 U.S.L.W. 3451 (No. 89–1018) (*"Ayuda"*). We are asked to infer from that ruling that the district court thereby lost all jurisdiction to preserve the status quo as to all of the other aliens whose rights were adjudicated in prior orders never appealed by the government to this court. I do not find this logic compelling.

The district court's initial declaratory judgment in favor of plaintiffs, and all but one of its supplemental orders in this protracted and wide-ranging case, retain the force of law at this point. As just noted, the government appealed in *Ayuda* only parts of one order of the district court, affecting only one group of aliens (the § 265 claimants). Moreover, the government affirmatively acquiesced in the district court's basic holding rejecting the INS' interpretation of the "known to the Government" provision of IRCA, 8 U.S.C. § 1255a(a)(2)(B).[2] Although the taking of an appeal divests the district court of jurisdiction and places it in the court of appeals, it does so only with respect to those aspects of the case involved in the appeal. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982). Thus, with respect to those claimants not directly involved in the *Ayuda* appeal, I believe the district court presently retains its authority to grant "further relief" under the Declaratory Judgment Act, 28 U.S.C. § 2202. *See Horn & Hardart Co. v. National Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir.), *cert. denied*, 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988).

The government argues that the court of appeals decision in *Ayuda*, finding no jurisdiction to grant relief in the case of the appealed order concerning the § 265 claimants, infects all of the prior orders concerning the non-§ 265 claimants. *Ayuda*, the government says, is the "law of the circuit" and no district judge may go against it in any way. Although that must certainly be true as to any future cases while the *Ayuda* decision remains extant, I question whether it means that a district court is barred in all circumstances from taking action to enforce or supplement decisions it has already rendered that have become final because the government has neither taken an appeal nor initiated a motion to vacate. The issue, in other words, is whether a district court must in all cases sit by and see its final orders undermined or violated outright because, in a separate appeal, the court of appeals has ruled in a way that could logically be applied to prior cases. Certainly the answer is not so easy as my colleagues would suggest in their laconic order.

It is also important to note that, due to the pendency of appellees' petition for certiorari in *Ayuda*, no mandate has issued from this court based on that decision. *See* Fed.R.App.P. 41(b). The jurisdictional issue decided in *Ayuda* is nonetheless squarely before the Supreme Court, which has granted certiorari in *Haitian Refugee Center v. Nelson*, 872 F.2d 1555 (11th Cir. 1989), *cert. granted sub nom. McNary v. Haitian Refugee Center*, —— U.S. ——, 110 S.Ct. 2584, 110 L.Ed.2d 265 (1990), a case that raises the identical issue.[3] If upheld by the Supreme Court in *McNary*, *Ayuda's* jurisdictional holding might (although even this is not altogether clear) implicate the authority of the district court

---

**2.** The *Ayuda* majority acknowledged as much. *See* 880 F.2d at 1328. *See also Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325 (D.C.Cir.1989) (Ruth B. Ginsburg, J., dissenting from denial of rehearing en banc) (noting "the court's recognition that the government has acquiesced in prior rulings of the district court ... [and] the court has precisely limited its judgment to the vacation of Supplemental Order V").

**3.** The Supreme Court apparently is holding the petition for certiorari in *Ayuda* in abeyance, at the request of the government, until it reaches a decision in *McNary*.

to grant further affirmative relief with respect to the non-§ 265 claimants, and for this reason the district court has cautiously refrained from granting permanent relief to any of the claimants while the jurisdictional question is pending before the Supreme Court. But, given the current absence of any mandate from the court of appeals and pending the final word on the jurisdictional issue from the Supreme Court, this discretionary exercise of restraint does not mean that the district court lacks jurisdiction to provide those claimants not directly involved in *Ayuda* with the interim relief that it concludes is essential to allow them to survive until such time as the Supreme Court acts. The district court's traditional authority to determine its jurisdiction—and the controlling effect of that determination if unchallenged on appeal—presently remains unimpaired as to these claimants. Until the Supreme Court rules on the underlying jurisdictional issue, that authority includes, minimally, the power to maintain the status quo. *See* C. Wright, *The Law of Federal Courts* § 16 (4th ed. 1983).

Given the lack of any controlling authority pointing in the opposite direction, I would give the district court the benefit of any doubt in this case as to its authority to preserve the status quo by ensuring that the claimants affected by the nonappealed orders are able to survive until the Supreme Court acts. Even if I am wrong and such authority does not exist, I believe the court of appeals itself has that authority and that we may temper or stay the "law of the circuit" in order to preserve the status quo until that law can be validated or rejected by the Supreme Court. It would be a cruel and irrational system of justice indeed that would not lodge that power somewhere and that consequently would permit those affected by this court's ruling in *Ayuda*, a challenge to which has already been argued in the Supreme Court,

to perish before they can enjoy the benefits of a possible victory.

It is a somewhat harder question for me whether the district court has jurisdiction to provide interim relief to the § 265 claimants, but on balance I conclude that it does not and that any interim relief given to these claimants therefore must come from this court. As noted above, a district court normally loses jurisdiction over all aspects of a case that are appealed. Ordinarily, then, this court would be the only court with jurisdiction to provide interim relief to the § 265 claimants given that no mandate has yet issued from this court pursuant to *Ayuda* and the Supreme Court technically has yet to act on the petition for certiorari. The rule depriving the district court of jurisdiction is, however, subject to a number of exceptions. A district court retains jurisdiction, for example, to issue orders in certain circumstances staying, modifying, or granting injunctions, to direct the filing of supersedeas bonds, and to issue orders affecting the record on appeal, the granting of bail, and similar matters. *See* Fed. R.App.P. 7, 8, 9, 10, 11; Fed.R.Civ.P. 62(c). Although none of these established exceptions directly applies in this case,[4] several courts have held that the rule, being judge-made rather than statutory, is merely prudential and should be departed from where considerations of judicial economy so dictate. *See, e.g., Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir.1988) ("[The rule] is designed to prevent the confusion and inefficiency that would result if both the district court and the court of appeals were adjudicating the same issues simultaneously. As a prudential doctrine, the rule should not be applied when to do so would defeat its purpose of achieving judicial economy.").

Ultimately, however, I agree with the government that the district court does lack jurisdiction to provide interim relief to

---

**4.** It is arguable that Fed.R.Civ.P. 62(c) provides authority for the district court's action with respect to the § 265 claimants. That rule provides as follows: "When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." *Cf.* Fed.R.App.P. 8(a). The unusual posture of this case makes it doubtful, however, that it is "pend[ing]" on "appeal" within the intended meaning of this rule.

the § 265 claimants. The government's appeal in *Ayuda* divested the district court of jurisdiction over those claimants and placed jurisdiction in this court, and it would take more than the superior factfinding and relief-granting capacities of the district court in this situation to justify departing from the traditional rule that the district court may not act further in the absence of a mandate from this court finally disposing of the appeal. Until the Supreme Court either grants certiorari in *Ayuda* or this court issues a mandate based on the *Ayuda* decision, this court is the only court that may provide interim relief to the § 265 claimants, and these claimants should pursue such relief in this court.[5]

I would therefore deny the motion for stay as to the non-§ 265 claimants[6] and grant it as to the § 265 claimants, indicating that the latter could apply for interim relief to this court. The *Ayuda* case has been a long and not yet completed trek for these aliens and for the district judge who

has presided over the case for more than two years. The immigrant claimants won the first several rounds, only to have one segregated portion of their ranks lose one appeal on jurisdictional grounds in the court of appeals. That ruling, in conflict with the Eleventh Circuit's decision in *McNary*, is currently under active consideration by the Supreme Court. But winter is almost here, and without temporary work permits many of the aliens face severe hardship. I believe it incumbent upon our judicial system to identify the proper source for stopgap relief in this situation and to act with dispatch upon their request for such relief. I can only hope that at some point our system does this.

---

5. Because I conclude that the non-§ 265 claimants survive the threshold jurisdictional challenge made by the government, I turn briefly to the analysis specified in D.C. Circuit Rule 7(h)(1) for a stay of a judgment or order of the district court. I believe that the government has failed to demonstrate that it or the public interest would be irreparably harmed if the motion for stay were denied as to the non-§ 265 claimants—in sharp contrast with the undeniable harm that will befall those claimants who cannot survive without work authorizations if a stay is granted.

As to the government's argument that it is likely to succeed on the merits in the underlying action, I do not agree that *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), necessarily deprives the district court of authority to order permanent relief to the affected aliens because they failed to file timely applications for naturalization. *Pangilinan* held that neither estoppel nor the equitable authority of courts to craft appropriate remedies gives federal courts the authority to order that someone be made a citizen of the United States. 486 U.S. at 883, 108 S.Ct. at 2215-16. However, as discussed in *In re Thornburgh*, 869 F.2d 1503, 1512-17 (D.C.Cir.1989), the situation presented in this case may significantly differ from that presented in *Pangilinan*. As noted in *Thornburgh*, "[t]he only form of relief specifically disapproved by the *Pangilinan* Court was the lower courts' asserted 'power to make someone a citizen of the United States.'" 869 F.2d at 1517. *Pangilinan* does not foreclose a due process challenge to the actions of the INS on the

grounds that appellees were afforded an unreasonably short period in which to file applications for amnesty; *Pangilinan* also does not explicitly rule out the concept of "constructive filing" within the statutory deadline by those aliens who attempted to comply but who, through no fault of their own, were prevented from doing so by INS action.

Two courts directly confronted with this issue have held that *Pangilinan* does not preclude relief. *See Zambrano v. INS*, Civ. No. S–88–455 EJG, opinion at 21 (E.D.Cal. Aug. 9, 1988) ("applicants who were discouraged from applying by reliance on allegedly illegal [INS] regulations have been denied the twelve month application period Congress intended"); *League of United Latin American Citizens v. INS*, No. 87–4757–WDK, opinion at 8 (C.D.Cal. Aug. 15, 1988) ("[w]hat is available [after *Pangilinan*], however, ... is an order enjoining the INS from denying [plaintiffs] the opportunity to apply for an adjustment of status on timeliness grounds when the untimeliness resulted from the INS' erroneous policy"). I therefore conclude that appellants have not met their burden of demonstrating that they are likely to succeed on the merits.

6. I would, however, limit the scope of the interim relief provided by the district court to those non-§ 265 claimants who have survived the eligibility screening process *and* who can make individual showings of their inability to meet minimal needs of food, shelter, and medical care.